SARAH A. BURTON'S ADMR. *v.* GEORGE H. BURTON.

October Term, 1908.

Present: ROWELL, C. J., TYLER, MUNSON, and WATSON, JJ.

Opinion filed January 16, 1909.

*Parent and Child—Deed to Child—Undue Influence—Presumption.*

The law regards with favor transactions between parent and child relating to their property rights, and does not minutely weigh the considerations on either side. Even ignorance of rights, if equal on both sides, may not avail to impeach the transaction.

The relation of parent and child raises no presumption of undue influence in respect of a conveyance from the former to the latter, but is evidence to be weighed in connection with other facts and circumstances against the child; and the burden is on the person attacking the conveyance to show, independent of any presumption, that the child exercised undue influence.

APPEAL IN CHANCERY, Rutland County. Heard at Chambers on February 28, 1908, on pleadings, master's report and exceptions thereto. *Hall*, Chancellor. Decree for the orator. The defendant appealed.

This is a bill in chancery to set aside a deed of land from the intestate to her son, the defendant, and the transfer to him of a savings bank deposit book, on the ground of mental incapacity and undue influence.

The intestate's husband died in January, 1902, leaving to her his entire estate. In March, 1902, she made her will, whereby she gave George, the defendant, a farm worth $3,000, and $1,000 to his wife, a few small legacies to their children and grandchildren, and the rest of her estate to George and her son Charles equally. Charles is a travelling salesman, has a wife but no children, and lives in the village of Wells. George is a farmer, and lived on his father's farm in Wells at the time of his father's death, but subsequently moved into the village of Wells, and

later, in April, 1903, moved with his family to the homeplace in the village where his mother lived, and from that time she was a member of his family. She was seventy-five years old when her husband died, had chronic Bright's disease, and a shock in 1900, thought to have been occasioned by the disease. She never afterwards fully recovered her speech, and was always thereafter more or less crippled in her limbs, and unable to walk without a cane, and part of the time not at all. The lameness, however, was said to have been caused largely by rheumatism, and might not have been due to the shock. Physically, she was much broken before her husband died, and never recovered her health, though she was better at times. The shock rendered her unconscious, but this condition passed away, and her mind, though somewhat weakened, was generally fairly good for one of her age until the spring of 1905, though during that period her mind was clouded at times, and her memory somewhat impaired. She was occasionally melancholy, and now and then wandering and flighty in mind. During all this time, disease and advancing years were doing their work, and in the spring of 1905 she had another and more serious shock, following which she took her bed, and steadily declined until she died in December of that year.

During the time George lived with his mother, the relations between him and Charles and their families were somewhat strained. George became the head of the family in his mother's house, and Charles felt that he was not welcome there, for which he had some ground, and therefore he saw less of his mother than he otherwise would, though he lived but a few rods away, and his mother occasionally visited him at his house. She grieved somewhat over this estrangement, and mourned that she saw less of Charles than of George. The bystanders and the witnesses of the deed sought to be set aside, testified that at the time of its execution she was in a sound and normal condition of mind, and there was no evidence to the contrary except that covering the period after her shock in 1900, which tended to show that her mind was impaired generally. Nothing occurred on the immediate occasion of the execution of said deed to excite suspicion, and the master finds, subject to the above statement about the impairment of her mind, that at the time she made the deed she was in a normal condition of mind, and comprehended the force and effect of it.

As to the transfer of the savings bank book, there was no specific evidence the master says on which he could make any finding as to her condition of mind at the time of the transfer, other than the general condition of mind above stated.

There was no evidence directly tending to show that George or his family had ever made any statement, nor that the intestate had ever said anything, indicating that direct request had been made to her, nor direct influence used upon her, to influence her in either of said transactions; and the master says that if undue influence is found, it must be as a conclusion of fact from the circumstances he reports.   He then goes on to say that before and at the time of said transactions, the intestate was a part of George's family, and relied upon him to manage and attend to her affairs; that her relations with him and his family were cordial, and that all the evidence tended to show that she was treated by him and his family with kindness and consideration; that as head of the family, he was her protector, confidant, and adviser; that his wife was conscientious in her attentions, cheerful in disposition, and perhaps somewhat insinuating in manner; that undoubtedly a prejudice existed in the family against Charles, and whether it was used against him with the intestate or not, no doubt she felt his absence as compared with George; that she was old, weak, and feeble, and the opportunity open, and the relations opportune, for George and his family to exercise influence against Charles; that it is impossible to get into the bosom of that family and ascertain exactly what took place there, and equally difficult to lay bare the facts, and learn what influences, if any, were operating upon the mind of the intestate; that those having the best opportunity to observe were divided; that one is impressed by the progressive movement of the property from the intestate to George, namely, that within a few weeks after the death of her husband, she made a will, giving the farm, worth $3,000, to George, and a $1,000 to his wife, and three or four hundred dollars to their children and grandchildren; that subsequently, in the same year, she conveyed the farm to him outright, thereby giving him the immediate possession and use of it; that in the spring of the next year, George went to live with his mother, and took possession of the homestead; that the next year she gave him the deed in question, thereby adding fifteen hundred to two thousand dollars to his share of his father's estate; that later, in the same year, she

transferred to him the bank book, evidencing a deposit with interest of $1,345; thus giving him and his family from sixty-nine to seventy-four hundred dollars, which, with half of the remainder, would make eighty-seven or ninety-two hundred dollars out of an estate of about $11,000.

•    The defendant claimed that the conveyance and the transfer were made pursuant to his father's request, and in consideration of his mother's support; but the master does not find that to be so.

The master says that if, in the circumstances, the burden is on George to show that he did not exercise undue influence, he has not shown it; but if, on the other hand, the burden is on the orator independent of any presumption, to show affirmatively that such influence was exercised, he has not established that fact. But the master, referring to certain recent decisions of this Court, goes on to say that he understands the rule therein laid down to be, that when a conveyance or a bequest is made to one standing in a confidential relation to the grantor or to the testator, the burden is on the party claiming under such conveyance or will to remove the suspicion cast upon such transaction by reason of such confidential relation, and that when a third person has the affirmative of the issue, this presumption becomes evidence to be weighed in his behalf in connection with all the other evidence in the case. He then goes on further to say that applying this rule, he finds that George stood in a confidential relation to his mother, and was her adviser and guide; that an undue proportion of the estate was transferred to him by his mother while he so acted and such relation existed; that he had not removed the suspicion or the presumption that the law cast upon him in these transactions, and that, giving the orator the benefit of that presumption in connection with the other evidence, he finds that the intestate was unduly influenced by George and his family to make the conveyance and the transfer in question.

*E. O. Farrar,* and *Lawrence & Lawrence* for the orator.

The master was right in holding that the burden was on the defendant to show his freedom from undue influence. *In re Rogers' Will,* 80 Vt. 259; *Hobart* v. *Vail,* 80 Vt. 152; *Allen* v.

*Allen,* 79 Vt. 173; *White's Will,* 78 Vt. 479; *Cowdry's Will,* 77 Vt. 359.

Butler & Moloney for the defendant.

The master was wrong in holding that the burden was on the defendant to show his freedom from undue influence. There is no presumption of undue influence in transactions between parent and child. *Gaither* v. *Gaither,* 20 Ga. 709; *Armstrong* v. *Armstrong,* 63 Wis. 162; *In re Martin,* 98 N. Y. 193; *Latham* v. *Udel,* 38 Mich. 238; *Rankin* v. *Rankin,* 61 Mo. 295; *Will of Andrews,* 33 N. J. Eq. 514; *In re Watkins' Will,* 81 Vt. 24; *Bush* v. *Delano,* 113 Mich. 321; *Ten Eyck* v. *Whitbeck,* 156 Mich. 341; *Doheny* v. *Lacy,* 168 Mich. 213; *Teegarden* v. *Lewis,* 145 Ind. 98; *Slayback* v. *Witt,* 151 Ind. 376; *Good* v. *Zook,* 117 Ia. 582; 4 Wig. on Ev. §252; *In re Barney Will,* 70 Vt. 353; *Moore* v. *Spier,* 80 Ala. 120; *Lyon* v. *Campbell,* 88 Ala. 469; *Bancroft* v. *Otis,* 91 Ala. 279.

ROWELL, C. J. It may be that the law would presume undue influence in this case if the relation of parent and child had not existed, and the question is whether the existence of that relation makes any difference.

Transactions between parent and child may proceed upon arrangements between them for the settlement of property or of their rights in property in which they are interested. In such cases the law regards the transactions with favor, and does not minutely weigh the considerations on either side. Even ignorance of rights, if equal on both sides, may not avail to impeach the transaction. But it is said that on principles of natural justice and considerations important to the interests of society growing out of the relation of the parties, the law examines, scrutinizes, weighs in golden scales, and holds *prima facie* void, transactions of bounty from child to parent so soon after majority that the child may probably not have been entirely free from parental influence therein. This is the doctrine of many of the cases, but some hold otherwise. Thus, in *Jenkins* v. *Pye,* 12 Pet. 241, 9 L. ed. 1070, the Federal Supreme Court refused to adopt that doctrine, and said that the interest of the child is abundantly protected by keeping a watchful eye over the transaction, to see that no undue influence was brought to bear upon it.

But it is very generally held that no presumption of undue influence arises from the relation, merely, in respect of gifts and voluntary conveyances without consideration from parent to child, though some children are thereby favored to the exclusion of others, and though the beneficiary is the adviser of the parent, and had the control and management of his affairs. 29 Am. & Eng. Ency. Law, 2nd ed., 132, 133.

Mr. Pomeroy says that when the parent is old, infirm, or otherwise in a condition of dependence upon his child, and the child occupies a corresponding relation of authority, conveyances conferring benefits upon the child may be set aside, but that cases of this kind plainly turn on the exercise of actual undue influence, and not on any presumption of invalidity, for a gift from parent to child is certainly not presumed to be invalid. 2 Pom. Eq., §962.

Mr. Bispham says that it has been held that in cases where the benefit moves from parent to child, there is no burden resting upon the child to explain the gift nor to show the fairness of the contract; and that this would seem to be entirely correct, though it need scarcely be added that any attempt at misrepresentation or overreaching would render the gift or contract voidable. Bisp. Eq., sec. 235.

It is said in *Oliphant* v. *Leversidge,* 142 Ill. 160, 170, 30 N. E. 334, that the presumption of fraud does not arise from the fact that the grantor is the father of the grantee; that in the case of a gift from a child to a parent, undue influence may be inferred from the relation, but never when the gift is from the parent to the child.

It is said in *Matter of Will of Martin,* 98 N. Y. 193, 197, that something more must be shown than the relation of parent and child and an opportunity for unfair dealing; that there must be evidence that the parent was imposed upon or overcome by the practices of the child to the benefit of the latter, before the burden of proof can be shifted.

In *Wessell* v. *Rathjohn,* 89 N. C. 377, 45 Am. Rep. 696, it was claimed that when the relation of father and child exists, and the child becomes the beneficiary under a deed from the father, the deed will be looked upon with great suspicion, and if it is not found to be upon adequate consideration, and the mental condition of the father is such from debility as to make

him easily subject to improper and undue influence, and the beneficiary has *opportunity* and *position* to exercise such influence and control, the deed will be set aside, although no actual fraud or undue influence is shown. The court said that there might be cases when a parent conveys property to his child, in which the presumption of fact is so strongly adverse to the child that the deed ought to be found against, unless the child proves that it was fairly and honestly made; but that in such a case there must be evidence tending to show, not simply that there might have been, but that there was, *mala fides;* that the relation of parent and child, as to presumption of fraud and the burden of proof to rebut the same, in business transactions between them, does not stand on the same footing as the relation of trustee and *cestui que trust,* guardian and ward, attorney and client, and the like, but belongs to a different class of relations, in which the presumption is not so strong, and does not arise in the same circumstances.

*Saufley* v. *Jackson,* 16 Tex. 579, was a suit to set aside a voluntary deed of gift of slaves from parent to child. The court said that an act or a contract by which a benefit is conferred by a child upon a parent will be set aside if there are any circumstances showing that it had been induced by undue influence of parental authority, and that it was a vexed question whether the mere existence of the relation did not itself make the transaction *prima facie* void; but that that doctrine seems now to be repudiated by the courts of this country, and has been modified in England, and that it is clear that that rule was never applied, unqualifiedly nor qualifiedly, to deeds of gift from parent to child, but that the reverse of that principle has always been sustained, and such deeds looked upon with favor and with favorable presumptions.

In *Teegarden* v. *Lewis,* 145 Ind. 98, 113, 40 N. E. 1047, 44 N. E. 9, the finding was that Deer, the intestate, when old, weak, and childish, and while making his home with the appellants, his son-in-law and daughter, and depending on them for his home and personal care and attention, and on his son-in-law to go with him and assist him in transacting all of his business,— made to them a gift of a considerable sum of money. There was no finding that he was subject to, nor easily influenced by, their persuasion, nor that they exercised any persuasion to obtain the gift, nor did it appear that at the time of the making of the

gift he had no other property, nor that by making it he dealt unjustly nor unequally with his other children; and the question was whether the relation existing and the infirmities of Deer enforced the presumption of undue influence, and cast the burden upon the recipients of the bounty to show the absence of such influence. Counsel for the appellants urged a distinction between cases in which the ordinary fiduciary relation exists and those in which the relation of parent and child exists. The court said that many of the cases recognize that distinction, though some of those cited involved transactions between parent and child and the distinction was neither considered nor observed, but the ordinary rule was applied. The court recognized and applied the distinction contended for, and said that if there was any strength in the exception to the general rule, it was indispensable that some element of positive fraud should be found, and that there was no such finding in that case.

*Slayback* v. *Witt,* 151 Ind. 376, 50 N. E. 389, was an action by the children and grandchildren of William Slayback, Sen., and Anna Slayback, deceased, against David Slayback, a son of the decedents, to set aside a deed of gift of a farm from his mothe ' to him, on the ground of unsoundness of mind of the grantor, want of consideration, undue influence, and nondelivery. The deed was set aside below, and partition ordered. It appeared that all of the children of the decedents had married and left home and were doing for themselves except David, the appellant, who never married, but remained at home with his parents, and took care of them as long as they lived. On the death of the father, his estate was divided among his heirs and his widow, who took the home farm, which was the land in question. Long before and at the time of the father's death, his family consisted of himself and wife and David. After his death, David and his mother lived together on the farm. David was kind and attentive to his parents, and especially so to his mother after his father's death. She was old and infirm when the deed was made, and her mind was weak but not unsound.

The court said that if the deed was to be set aside it must be on the ground that it was procured by the undue influence of David, and that there was no evidence of such influence unless the fact was required by law to be presumed from the condition and situation of the parties to the deed and the circumstances surrounding the transaction. Counsel for the appellees con-

tended that undue influence must be presumed in the circumstances; that if the relation of parent and child had not existed, there being no valuable consideration for the deed, the uniform current of authority everywhere would require the presumption of undue influence, and the setting aside of the deed, unless the presumption was rebutted by affirmative proof. But the court said that the line of cases cited was not applicable to the case, because of the relationship of the parties to the deed; that it was true that some of the cases cited sanctioned the contention that the rule was applicable to the case, but that the great weight of modern authority is the other way, and judgment was reversed on the strength of *Teegarden* v. *Lewis,* above cited, because there was no evidence of actual undue influence, and because in such cases no presumption of undue influence arises.

*Mackall* v. *Mackall,* 135 U. S. 167, 34 L. ed. 84, 10 Sup. Ct. 705, was a bill to set aside a deed of land from father to son on the ground of undue influence. It appeared that for twenty years the father and mother had been separated, and that this son had remained with the father, taking his part, and assisting him in his business, and that the other children had gone with the mother, and taken her part in the family difficulties. The court said that influence gained by kindness and affection will not be regarded as undue if no imposition nor fraud is practiced, even though it induces the testator to make an unequal and unjust disposition of his property in favor of those who have contributed to his comfort and ministered to his wants, if such disposition is voluntarily made; that right or wrong, it is to be expected that a parent will favor the child who stands by him, and give his property to such child rather than to the others; that to defeat a conveyance made in such circumstances, something more than the natural influence arising from such relationship must be shown, that imposition, fraud, importunity, duress, or something of that kind, must appear, otherwise, the disposition of property that accords with the natural inclination of the human heart must be sustained.

*Towson* v. *Moore,* 173 U. S. 17, 43 L. ed. 597, 19 Sup. Ct. 332, was a bill in equity by children of Leonidas Campbell, son of William Campbell, against the two daughters of William Campbell and their husbands, Moore and Russell, who were also executors of the wills of William Campbell and Mary Campbell, his widow and residuary devisee and legatee,—to set aside a

gift by her to their two daughters of certain government bonds, as having been obtained from her by the undue influence of themselves and their husbands.

It appeared that after the death of her husband, Moore was the business agent of the mother, who resided alternately with one or the other of her two daughters, living on affectionate and confidential terms with them and their husbands; and that at the time of the gift and her death, she was at the house of her daughter Mrs. Moore. The plaintiffs contended that the burden of proof was upon the donees to show the validity of the gift. But the court held otherwise, and said that the principles established by its decisions are, that in case of a gift from child to parent, the circumstances attending it should be carefully scrutinized in order to ascertain whether there had been undue influence in obtaining it; but that it could not be deemed *prima facie* void; that the presumption is in favor of its validity; and that in order to set it aside, the court must be satisfied that it was not the voluntary act of the donor; and that the same rule as to burden of proof applies with equal if not greater force to the case of a gift from parent to child, even if the effect of the gift is to confer upon a child with whom the parent makes his home and is in peculiarly close relations a larger share of the parent's estate than will be received by other children.

*Lockwood* v. *Lockwood,* 80 Conn. 513, 69 Atl. 8, was an application by Alice Lockwood and others for the probate of her mother's will. It was claimed by the contestants that certain clauses of the will, by which a larger portion of the testatrix's property was given to her daughters Alice and Emily than was given to her other children, were procured by the undue influence of Alice and Emily, and especially by Alice; and the jury so found, and the decree of the probate court as to those clauses was set aside. The testatrix's husband died in 1878, leaving nine children. At the time the will was made in 1901, Emily, Alice, Irving and Ada, all unmarried, lived at home with their mother. The rest of the children were married and away for themselves. The contestants introduced the testimony of several witnesses, one of whom was the judge of probate, who testified that he drew the will from instructions given to him by the testatrix at two or three interviews, at which times Alice came with her mother and was present when the interviews took place. The other witness testified to things from which the contestants

claimed that the jury should infer, in connection with the testimony of the judge of probate, that at the time the will was executed the testatrix was not only physically weakened by sickness, but that the natural vigor of her mind was so impaired that she had less power to resist the persuasion of influence; that Alice and Emily had acquired a controlling influence over her; that Alice's relation to her was one of special trust and confidence; and that Alice and Emily did in fact, by the exercise of influence over her, constrain her to insert in her will the objectionable clauses against her wishes.

There was no direct testimony as to the actual exercise of any influence in procuring the discriminating provisions of the will except that of Emily, who testified to her relations with her mother, and that she took no part in the making of the will; and that of Alice, that she did not attempt to influence her mother; and that of the judge of probate, that at the interviews named by him he saw nothing indicating the exercise of undue influence.

The court charged that if the evidence indicated that the relation of Alice to her mother was one of trust and confidence, and that she had benefited by her acts in that relation, then it was incumbent on the proponents to show that she acted fairly, and took no advantage of her position to induce the making of the will in her favor. The nature of the relation of special trust and confidence referred to, and of the evidence from which its existence might be inferred, was stated to the jury to be that there was testimony tending to show that Alice was for a number of years entrusted with a key to a box in the vault of a New York safe deposit company in which her mother's securities were kept, and so had access to those securities at all times; that she cut the coupons, and collected the money for her mother; that she was in the habit of receiving checks from her mother payable to herself, and of collecting the money on them for her mother; and that she assumed to advise her mother as to indorsement of notes, and advised her in affairs generally.

The court said that the charge, in effect, instructed the jury that the relation of confidence that existed between Alice and her mother raised a presumption which, unless overcome by rebutting evidence, established the fact of undue influence, and cast upon the proponents the burden of satisfying the jury that no such influence was exercised. The court said that there is

a broad distinction between the effect of a confidential relation of a legatee to·the testator as suggestive of undue influence when the legatee is a stranger and when he is a child; that in the case of a child, both the relation of confidence and some participation in the estate are natural, which cannot be said of a stranger as a general proposition. The court adopted and applied its language in *Dale's Appeal,* 57 Conn. 127, 17 Atl. 757, where it said that though the mother and the son dwelt together in the same house, and every opportunity was open to him to exercise influence over his mother, still, as matter of law, the burden remained with the contestant, and it was for him to prove that the son abused the confidence of the mother, or that his superior mind so dominated her that, unable to resist, she surrendered her judgment and will to him; and that this the contestant was not required to do by direct evidence, but was permitted to do wholly upon inferences drawn merely from the opportunity for coercion by threats or inducement by flattery, which was error.

The court said that the failure in the case before it of the court below to impress upon the jury in any effective way the distinction between the possible probative effect of a relation of trust and confidence existing between the testatrix and a stranger and the same relation existing between the testatrix and her daughter, a member of her household, was, in the circumstances, harmful error.

This is precisely the error the master made in this case, for he adopted and acted upon the rule applicable only to the relation of attorney and client, guardian and ward, and the like, and thereby failed to distinguish the difference in possible probative effect between such relations and confidential relations between parent and child. The former relations, in practical effect, as said in the *Lockwood* case, change a permissible inference of fact in the case of a child, to a necessary presumption of fact in the case of an attorney or a guardian; or, in other words, change such permissible inference of fact from one that might, as matter of reasoning, show undue influence, to one that certainly, as matter of law, is *prima facie* proof of such influence.

The master saying that he could not find undue influence without applying the rule he did, which was wrong, his finding cannot stand; and as the orator seeks to recover on no other ground, the case must go against him.

*Decree reversed and cause remanded with mandate to dismiss the bill with costs in this Court, and with or without costs below as may be there determined.*

MUNSON, J., concedes that the authorities are as stated, but questions the soundness of the reasoning on which the rule changing the burden is held inapplicable as between children regardless of circumstances, and therefore withholds concurrence.